This case involves interpretation of a homeowner's insurance policy issued by Great American Insurance Co., Inc. The only dispute is whether that policy provides coverage for certain personal injuries suffered by the plaintiff, Thomas Broadway.
The following facts are pertinent: Sometime in September 1982, George Ryals purchased a 1974 Dodge Duster automobile as a high school graduation present for his son. Ryals's son drove the car for approximately three months. Then, apparently sometime in December, Ryals's son called from school and informed his father that he was having problems with the vehicle. Ryals proceeded to Prattville High School, where the car was parked, hooked a chain *Page 1125 
to it, and, using his company pickup truck, towed the car back to his residence in Prattville. Upon arriving at his home, he cranked the vehicle momentarily and then moved it into a tin garage behind his house where he frequently does repair work on his vehicles. He subsequently determined that the car needed extensive repairs, amounting to a complete engine overhaul. Because he did not have the money at that time to make the needed repairs, he left the Duster parked in the shed for approximately one month. Thereafter, he removed the engine from the vehicle and proceeded to rebuild it.
On March 1, 1983, Kirk Alison went to Ryals's home after work to help him complete repairs on the Duster. Thomas Broadway, who car-pooled to and from work with Alison, accompanied him.[1]
Ryals and Alison worked on the car approximately two hours, remounting and reconnecting the engine, preparing it to be started. During this time, Broadway, who had no mechanical aptitude, stood nearby and watched. After the engine was remounted and reconnected, except for the valve covers, Ryals and Alison attempted to crank it in order to set the engine's timing. Ryals entered the passenger compartment and turned the ignition switch, while Alison primed the previously dry carburetor by pouring gasoline into it. At that point the engine backfired, igniting the cup of gasoline that Alison was holding. A portion of the burning gasoline spilled onto Alison's hand, burning it and causing him to throw the cup of burning gasoline toward the front of the car. The cup struck the nose of the vehicle and spattered burning gasoline onto Broadway, setting his clothes afire. As a result, Broadway suffered burns to his chest, stomach, and legs.
Broadway brought suit against Ryals and Alison, charging negligence, and also filed claims with American States Insurance Company, which provided automobile coverage on the Duster, and Great American Insurance Co., Inc., with whom Ryals had the homeowner's insurance policy previously referred to. After conducting an investigation, American States determined that its policy provided coverage, settled with Broadway for $7,500, and obtained a release. Great American, on the other hand, denied coverage.
After settlement with American States, Broadway continued to prosecute his negligence action against Ryals and Alison, eventually obtaining a default judgment in the amount of $25,000. Another claim was then filed with Great American, which again denied coverage. As a result, Broadway brought suit directly against Great American, which counterclaimed, seeking a judgment declaring that its policy did not cover Broadway's injuries. Both Broadway and Great American moved for summary judgment. On May 30, 1984, the Circuit Court of Montgomery County granted summary judgment in favor of Great American.
It is undisputed that on March 1, 1983, Ryals was the owner of a homeowner's policy issued by Great American. It is also undisputed that the policy contained the following exclusions:
 "1. Coverage E — Personal Liability and Coverage F — Medical Payments to Others do not apply to bodily injury or property damage:
"* * *
 "e. arising out of the ownership, maintenance, use, loading or unloading of:
"(1) an aircraft;
 "(2) a motor vehicle owned or operated by or rented or loaned to any insured. . . ."
Great American contends that Broadway's injuries occurred during maintenance of the vehicle in question and therefore are excluded from coverage. Broadway argues, as he did before the trial court, that *Page 1126 
at the time of his injuries the Duster was not a motor vehicle within the meaning of the exclusion. His argument is based on that portion of the definitions section of the policy, which defines "motor vehicle" as:
 "[A] motorized land vehicle designed for travel on public roads or subject to motor vehicle registration. A motorized land vehicle in dead storage on an insured location is not a motor vehicle."
Broadway asserts that, even though maintenance was being performed on the Duster at the time of his injuries, because the vehicle had been inside Ryals's shed for over three months without being driven, it was in "dead storage" on the insured location. Great American counters by arguing that, because repairs were being performed on the car at the time of Broadway's injuries, the automobile was not in dead storage. In granting summary judgment, the trial court agreed with Great American, holding:
 "[T]he Court having considered same is of the opinion that the automobile in question was not in dead storage; rather, was in the process of either maintenance, repair, or use, at the time of the injury to Thomas Broadway on March 1, 1983; thus, the aforesaid injury was automobile-related and is squarely within the terms of the exclusion in Great American's homeowner policy."
We agree with the trial court's interpretation of the policy.
This Court has never before been called upon to decide a case of this nature; however, the Third District Court of Appeal of our neighboring state Florida, in Lawson v. Allstate InsuranceCo., 456 So.2d 1235 (Fla.Dist.Ct.App. 1984), has. In that case, the Florida court held that a vehicle which was being restarted after undergoing extensive engine repairs was not in storage of any kind.
Because the facts in Lawson are so strikingly similar to the facts of the present case, we set forth that opinion in toto:
 "At issue is whether a vehicle was in `dead storage' at the time it caused injury to a minor plaintiff so that coverage was available under a homeowner's policy of insurance.
 "The facts show that in July 1979 Jim Hazelrig towed a truck to his truck repair business for the purpose of replacing an engine. He could not find a replacement engine so he removed the one from the truck and sent it to another company to be rebuilt. The truck sat outside his building in that condition for almost seven months. On or about February 6, 1980, the rebuilt engine was returned. Two days later, Hazelrig completed reinstalling the engine and attempted to start the truck. His friend, Clarence Neville, who volunteered to help, poured gasoline into the carburetor from a cup while Hazelrig cranked the engine. A spark ignited the gasoline and Neville threw the cup and gasoline over his shoulder. Neville's minor grandson, Scott Lawson, who was standing nearby, was severely burned. Lawson brought suit against, inter alia, Allstate Insurance Company, Neville's insurer under a homeowner's insurance policy. Allstate's denial of coverage was based on the following exclusionary provision:
 "`We do not cover bodily injury or property damage arising out of the ownership, maintenance, use, loading or unloading of any motorized land vehicle or trailer. However, this exclusion does not apply to:
 "`(a) a motorized land vehicle in dead storage or used exclusively on the residence premises. . . .'
 "At a hearing on a Request for Declaratory Judgment, the trial court concluded that because the truck was not in dead storage at the time of the incident, the exclusion applied, resulting in no coverage.
 "We agree that generally where a vehicle is left with a garageman for the purpose of making repairs it is not in storage. See Owens v. Pyeatt, 248 Cal.App.2d 840, 57 Cal.Rptr. 100, 105 (1967) (no charge for storage is implied during the period of time an automobile left with a garageman is undergoing repairs); *Page 1127 Topeka Railway Equipment, Inc. v. Foremost Insurance Co., 5 Kan. App. 2d 183, 614 P.2d 461 (1980) (where the primary purpose of a bailment contract was to carry out modification and repair of railroad cars, possession or physical control of that property by insured and its incidental storage or safekeeping while insured was awaiting opportunity to carry out purpose of contract did not amount to `storage or safekeeping' within meaning of exclusionary portion of insurance contract). Commercial storage contemplates a safekeeping, generally for a reasonable [value] with an agreement that the property be returned in the same condition. See Bankers Commercial Corp. v. Mittleman, 21 Misc.2d 1096, 198 N.Y.S.2d 184, 186 (Sup.Ct. 1960). It is unnecessary to decide whether there was a `live' or `dead' storage because we find no storage in the first instance."
This Court is, of course, aware that Lawson is distinguishable because the court therein narrowly based its decision on the fact that the vehicle was in the possession of a "garageman" at the time the injuries complained of occurred. Nevertheless, this Court is of the opinion that Lawson supports a broader principle, that where an automobile is temporarily put away for the purpose of undergoing maintenance it cannot be considered as being in storage, either live or dead. It would be illogical to hold that a vehicle delivered to a mechanic for the purpose of making repairs is not in storage, but that the same vehicle, if placed out of commission at the owner's home for the same purpose, is.
As this Court perceives the terms "dead storage" and "maintenance of a motor vehicle," they are mutually exclusive. In other words, a motor vehicle in dead storage is one which is not undergoing maintenance, while a vehicle which is undergoing maintenance cannot be in dead storage.[2] Regardless of the status of the Duster during the time it remained in Ryals's garage untouched, it was undergoing maintenance at the time Broadway's injuries occurred; consequently, it was not in dead storage. Therefore, the dispositive questions are whether "maintenance" was being performed on the Duster at the time Broadway's injuries occurred and, if so, whether his injuries arose out of that maintenance, within the meaning of the exclusion. We find that both questions must be answered in the affirmative.
It is undisputed that, just prior to the accident causing Broadway's injuries, Ryals and Alison had completed remounting and reconnecting the Duster's engine and that, at the moment the accident occurred, they were trying to crank it by pouring gasoline into the carburetor. In another Florida case,Volkswagen Insurance Co. v. Dung Ba Nguyen, 405 So.2d 190
(Fla.Dist.Ct.App. 1981), an attempt to crank a truck using the same method was held to be maintenance within the meaning of a homeowner's policy, even though no work was performed on the engine immediately prior to its being cranked. In Dung BaNguyen, just as in the present case, the plaintiff was injured when a cup of gasoline which was being used to prime a carburetor was accidently ignited and thrown onto him.
In determining if a homeowner's policy owned by one of the defendants provided coverage, Florida's Third District Court of Appeal wrote:
 "We find no coverage under this policy for the following reasons:
 "This policy provides coverage for personal liability to third parties. The policy contains an exclusion which specifically precludes coverage for the `maintenance,' *Page 1128 
`operation' or `use' of a motor vehicle. The exclusion reads as follows:
"`This policy does not apply:
 "`. . . a. to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of:
"`. . .
 "`. . . (2) any motor vehicle owned or operated by, or rented or loaned to any Insured. . .' (emphasis supplied)
 The attempt to start the truck by pouring gas into the carburetor, which resulted in the ignition of the gas, involved the `maintenance' of the vehicle within the terms of this exclusion.
 "The term `maintenance' has recently been so interpreted by the Fourth District Court of Appeal in connection with a homeowner's policy exclusion similar to Continental's. Indiana Insurance Co. v. Kip Winston, 377 So.2d 718 (Fla. 4th DCA 1979). There, the plaintiff assisted the defendants in removing the hood of a car to modify it to accommodate an air scoop. The hinges remained attached to the car and they were depressed by defendants in the position they would have been if the hood were closed. Plaintiff leaned on the vehicle and suddenly one hinge released, striking him in the eye. Plaintiff sued the automobile carrier, which covered `maintenance' of the vehicle, and the homeowner's insurer, which excluded `maintenance' of the automobile. In finding that the exclusion applied, the court stated that `. . . we do not believe an ambiguity exists here'. The court further held that:
 "`Thus, as a general proposition, it can be said that but for the maintenance of the hood hinge, an integral part of the automobile involved herein, the injury would not have occurred.
 "`Finally, while we acknowledge that the injured party in this case was not himself actively engaged in the maintenance of the car at the time of the injury, we still believe his injury arose from a condition created during the maintenance of the vehicle. The term "maintenance" has been defined as the labor of keeping something in a state of repair or efficiency. See Truck Ins. Exchange v. Aetna Cas. Sur. Co., 13 Wn. App. 775, 538 P.2d 529
(1975) and cases cited therein. Appleman, in his treatises, indicates that the term maintenance would seem to include acts of either commission or omission relative to the external or mechanical condition of a vehicle. 6B Appleman, Insurance Law and Practice, Sec. 4315, p. 339. We find that the control and subsequent placement of the hinge played an inseparable role in the installation of the air scoop, whose installation can be defined as the maintenance of the automobile (i.e., it keeps the vehicle in a state of efficiency).'
 Here, as in Winston, supra, but for the maintenance of the carburetor, the injury to Ming would not have occurred. In addition, it was not necessary for Ming to participate in the actual pouring of the gas into the carburetor for the exclusion to apply. The section of Appleman, cited by Winston, also provides that:
 "`"Maintenance" covers all acts which come within its ordinary scope and meaning. . . . Similarly, negligence in cleaning the automobile or in negligent use of the carburetor would be covered under this rule.'
 7 Appleman, Insurance Law and Practice § 4315 (emphasis supplied)
 Since the term `maintenance' was held to be unambiguous, authorities using that term with reference to an automobile policy's insuring clause are also persuasive.
 "If pouring gas into a carburetor involves its maintenance for purposes of an insuring clause, the same definition would exist for an exclusion because the term is not ambiguous. Winston, supra. Accordingly, since the pouring of gas in the carburetor was done for the purpose of starting the truck, resulting injuries suffered by Ming arose out of the maintenance of the vehicle." (Footnote omitted.) *Page 1129 
This Court finds the reasoning expressed in Dung Ba Nguyen to be sound. Therefore, we adopt that reasoning and find that, at the time Broadway's injuries occurred, Ryals's Dodge Duster was undergoing maintenance within the meaning of Great American's policy exclusion. Furthermore, we find that his injury was a direct and proximate result of that maintenance. Consequently, this Court is of the opinion that coverage under Great American's policy was properly denied and that the trial court committed no error in so holding.
The summary judgment granted in favor of Great American is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.
[1] The record shows that Ryals, Alison, and Broadway were all employed by the same company and that Ryals was the supervisor of the other two. There is, however, no allegation that the accident in question occurred while any of those involved were working within the line and scope of their employment.
[2] We should not be understood as holding that in all cases once maintenance is begun, dead storage ends. We can conceive of situations in which initial repairs are begun but for some reason are discontinued for an extended period of time, perhaps several months or years. We cannot say that in such a situation the vehicle would not reacquire the status of being in dead storage. Such is not the case here. The evidence clearly shows that after finally beginning repairs, Ryals continued to work on the Duster regularly, although intermittently, for a week. In any event, there is no doubt that he worked on it just prior to Broadway's accident.