587 A.2d 1185

**ALLSTATE INSURANCE COMPANY**

**v.**

**Jeffrey Lee GEIWITZ, et al.**

**No. 922, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

April 3, 1991.

Glenn W. Trimmer (Rollins, Smalkin, Richards & Mackie, on the brief), Baltimore, for appellant.

Karen I. Kerr (Michael J. Budow and Budow and Noble, P.C., on the brief) Ellicott City, for appellees, State Farm Fire and Cas. Co. and David and Patricia Cecil.

Donna M. Larkin (Richard D. Bennett and Weaver, Bendos & Bennett on the brief) Baltimore, for appellees, Jeffrey, Ellsworth and Frances Geitwitz.

Argued before MOYLAN, ALPERT and DAVIS, JJ.

ALPERT, Judge.

Allstate Insurance Company, appellant, filed a declaratory judgment action seeking a declaration that property damage tortiously caused by Jeffrey Lee Geiwitz, appellee, was not covered by a homeowner's insurance policy under which Geiwitz was an insured. Allstate now appeals to us

from an order of the Circuit Court for Carroll County in which the court entered judgment against Allstate.

## Facts and Proceedings

In 1984, Jeffrey Lee Geiwitz bought a "skeleton" car—a 1970 Chevrolet Nova—for restoration. The seller delivered the car to Geiwitz, after which time Geiwitz never drove the car but proceeded to restore it for show purposes. For six months, Geiwitz kept the car at his parents' residence while he disassembled it. He subsequently loaded the car onto a trailer and took it to a Hampstead Amoco station to have body work and painting done. When the work was completed in late December 1985 or early 1986, the station owner transported the car via trailer to David and Patricia Cecil's (appellees) residence. Geiwitz completed his restoration work on the car in January 1986.

Geiwitz then improperly obtained Maryland license tags for the car by giving the Motor Vehicle Administration the tag number and body number of his 1973 Datsun, which he regularly drove and which was validly insured. Geiwitz purportedly obtained the tags for show purposes, *i.e.*, to enter the Nova into a street car class competition. In February 1986, Geiwitz showed the car at the "World of Wheels" in the Baltimore Convention Center. Geiwitz transported the car to the Convention Center via a truck-pulled trailer. In his deposition, Geiwitz testified that he did not drive the car to the Convention Center "[b]ecause it's not, the car is not that, it's just for show. It wasn't made for driving." Geiwitz continued to store the car in the Cecils' driveway where he worked on it from time to time. Geiwitz did general maintenance and "little things that needed to be fixed," including tuning and cleaning the engine, changing the clutch, changing the oil and the oil filter. He worked on the car in the Cecils' garage three or four times prior to the incident at issue in this case.

On the evening of March 8, 1986, Geiwitz drove the car into the Cecils' garage to fix the gas gauge. He brought a kerosene heater from the Cecils' basement into the garage,

lit the heater, and positioned it in the middle of the floor—about ten feet away from the car. Geiwitz drained the gasoline from the car's gas tank into a bucket, which overflowed. When he noticed the gas flowing toward the kerosene heater, Geiwitz went to move the heater, at which point the gas ignited. The fire destroyed Geiwitz's car and extensively damaged the Cecils' property.

State Farm Fire and Casualty Company, appellee, paid the Cecils, its insureds, $124,841.85 for their property damage from the fire. State Farm then filed a tort action against Geiwitz in the Circuit Court for Carroll County, seeking subrogation. Because Geiwitz resided in his parents' household, he was an insured person under their homeowner's policy. Specifically, Geiwitz was covered under a Deluxe Homeowner's Insurance Policy, No. 018413396, issued by Allstate Insurance Company. The policy, however, provides that:

> 5. We do not cover bodily injury or property damage arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of any motorized land vehicle or trailer. However, this exclusion does not apply to:
>
> a) a motorized land vehicle in dead storage or used exclusively on an insured premises. . . .

Consequently, Allstate filed a declaratory judgment action on the grounds that the homeowner's policy did not cover the subject loss due to the "automobile exclusion" provision. Both State Farm and Allstate filed cross-motions for summary judgment. After oral argument on the motions, the court granted summary judgment in favor of appellees. Allstate appeals to us from that ruling and asks whether:

> I. The trial court erred when it held that the subject vehicle was in "dead storage."
>
> II. The trial court erred when it ruled that the homeowner's policy provided coverage because the subject vehicle was not used on public highways.

## I.

Allstate contends that the trial court erred when it held that the subject vehicle was in "dead storage." [1] It submits that in interpreting an insurance contract, a court must give words their "customary and normal meaning." On this basis, Allstate argues that "dead" in this context means "totally inoperable, incapable of any function whatever," while "storage" means that which is put "beyond use, beyond any handling or dealing with them in the ordinary course of things." Thus, reasons Allstate, Geiwitz's car was not "in dead storage" within the meaning of the policy because the car "was fully operable, was in fact driven from place to place, was being used as an automobile and was regularly repaired and maintained."

In *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388–89, 488 A.2d 486 (1985), the Court of Appeals set forth the principles of insurance contract construction in Maryland:

> An insurance contract, like any other contract, is measured by its terms unless a statute, a regulation or public policy is violated thereby. To determine the intention of the parties to the insurance contract, which is the point of the whole analysis, we construe the instrument as a whole. Maryland courts should examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.

*Id.* In so doing, "we accord a word its usual, ordinary and accepted meaning *unless* there is evidence that the parties intended to employ it in a special or technical sense." *Cheney v. Bell National Life Ins. Co.*, 315 Md. 761, 766, 556 A.2d 1135 (1989) (emphasis added).

"Courts may construe unambiguous contracts as a matter of law." *Pacific Indemnity*, 302 Md. at 389, 488 A.2d 486. "That a term cannot be precisely defined so as to make

---

**1.** *See* section II *infra* for those facts from which the circuit court concluded that the car was in dead storage.

clear its application in all varying factual situations does not mean that it is ambiguous." *Allstate Ins. Co. v. Humphrey*, 246 Md. 492, 496, 229 A.2d 70 (1967). The parties concede that the term "dead storage" is not ambiguous as used in the homeowner's policy. We agree. Further, even if we concluded that the term was ambiguous, we still could determine the proper construction of the policy because there is no factual dispute in the evidence. *Pacific Indemnity*, 302 Md. at 389, 488 A.2d 486.

Lay dictionaries, such as Webster's Third New International Dictionary, do not define the term "dead storage." Black's Law Dictionary, however, defines the term as follows: "The storage, especially of automobiles in public garages, where automobiles not in use are to remain uninterruptedly for a time, sometimes for the season." Black's Law Dictionary 359 (5th ed. 1979). The definition originated in *Hogan v. O'Brien*, 123 Misc. 865, 206 N.Y.S. 831, 832, *aff'd*, 212 A.D. 193, 208 N.Y.S. 477 (1924), in which the court addressed the extent of a garage keeper's responsibility for cars placed in his garage for storage. The court in that case also distinguished "dead" from "live" storage, defining the latter as "the storage of cars in active daily use." *Id.* Although not directly on point, the *Hogan* court's definitions of dead and live storage indicate that the term "dead storage" cannot be defined by simply separating the two words and then combining the common meaning of each. Instead, we think that the term "dead storage," as it appears in insurance policies, is employed in a technical sense or as a term of art and should be interpreted accordingly.

Maryland courts have not yet addressed the issue of when a car is in dead storage for purposes of coverage under a homeowner's insurance policy. Other courts that have addressed the issue have resolved it based on the facts of each individual case. *See* Annotation, Liability Insurance: When is Vehicle in "Dead Storage," 48 A.L.R.4th 591 (1986).

Usually, the issue of whether a vehicle is in dead storage arises from similar fact patterns. An insured owns a vehicle for *transportation* purposes. For some reason, usually because the vehicle is inoperable, the insured has not used the vehicle, *i.e.*, driven the vehicle on the public roads or elsewhere, for a period of time. Whether the vehicle is registered or insured varies. Often, an incident that results in bodily injury or property damage will occur from the insured's "maintenance" of the vehicle, *i.e.*, from the insured's attempts to make the vehicle operational again. On these facts, a majority of courts have held that a vehicle undergoing maintenance cannot also be in dead storage because the terms are mutually exclusive.[2] *See Broadway v. Great Am. Ins. Co., Inc.*, 465 So.2d 1124 (Ala.1985) (car stored in shed for one month before insured repaired it was undergoing maintenance, and therefore was not in dead storage, when gasoline used to prime carburetor ignited and burned bystander); *Holliman v. MFA Mutual Ins. Co.*, 289 Ark. 276, 711 S.W.2d 159 (1986) (disabled car that owner never insured, licensed, or registered, but drove on public roads, was undergoing maintenance, and therefore was not in dead storage, when gasoline used to prime carburetor ignited and burned bystander after car had sat in shed for two months); *Prudential Property & Casualty Ins. Co. v. Allaire*, 25 Mass.App.Ct. 159, 516 N.E.2d 179 (1987) (car was undergoing maintenance, and therefore was not in dead storage, when it lurched forward during an engine tune-up and struck a bystander even though owner had cancelled insurance and registration and taken car off the road, although he intended to re-register and re-insure it sometime later that year); *North Star Mutual Ins. Co. v. Carlson*, 442 N.W.2d 848 (Minn.Ct.App.1989) (vehicle without battery in it that had not been driven or otherwise moved for over four years and was overgrown with weeds and hay, but which owners intended to sell at auction for

---

**2.** It is important to note that the provisions of the policies in these cases are not always the same, and are different than those at issue in this case.

transportation, was undergoing maintenance, and therefore was not in dead storage, when the can of gasoline used to prime the carburetor burst into flames and burned a by-stander after the owner threw the burning can).

One court, however, has held that a car *can* undergo maintenance and still be in dead storage. In *Beale v. State Farm Fire and Casualty Co.*, No. 67 (Tenn.Ct.App. Apr. 8, 1985) (LEXIS, State Library, Tennessee file), a car owner stored his car in a carport for several months after the car became disabled. The owner later attempted to start the car, intending to move it to his parents' home. While charging the battery, the owner caused gasoline to spill underneath the car when he tried to repair a crimp in the fuel line. A spark from the battery charger ignited the gasoline, resulting in a fire that caused extensive property damage.

The Tennessee Court of Appeals noted that under the language of the policy, "even though someone is perform-ing maintenance on the car, if it is in dead storage, insur-ance coverage is not precluded." [3] Thus, the only question before the court was whether the car was in dead storage when the incident occurred. The court concluded that it was in dead storage for several reasons: (1) the car had been inoperable for several months, (2) the car did not have a current city sticker, and (3) the owner used another vehicle for transportation. The court also noted that even if the owner successfully had moved the car from the carport to his parents' residence, "the simple movement of the vehicle did not affect its status." That is, the mere fact that the owner moved the car from one storage site to

---

**3.** The provision states that " '[t]his policy does not apply ... to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of ... any motor vehicle." The policy, however, further stated that the exclusion " 'does not apply to bodily injury or property damage occurring on the residence premises if the motor vehicle is ... kept in dead storage on the residence premises.' " *Beale v. State Farm Fire and Casualty Co.*, No. 67 (Tenn. Ct.App. Apr. 8, 1985) (LEXIS, State Library, Tennessee file).

another did not take the car out of dead storage within the meaning of the insurance policy.

The primary difference between these cases and the case *sub judice* is the fact that Geiwitz kept the car as a collectable, *not* as a means of transportation. The language of the homeowner's policy itself suggests that the purpose of the exclusionary clause was to disallow coverage specifically for vehicles used for transportation on public roads.

> 5. We do not cover bodily injury or property damage arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of any motorized land vehicle or trailer. However, this exclusion does not apply to:
>
> > a) a motorized land vehicle in dead storage *or used exclusively on an insured premises....*

(emphasis added). Vehicles used for transportation on public roads necessarily would have to be insured under an automobile insurance policy. The automobile policy, then, would cover any bodily injury or property damage that arose from vehicle-related incidents. Because Geiwitz did not use the car for transportation purposes, there was no reason for him to purchase an automobile insurance policy. We think that under these circumstances, he reasonably could have believed that the homeowner's policy would cover any bodily injury or property damage from a vehicle that was kept as a collectable item rather than a means of transportation.

Factually, this case is most similar to *Sharpe v. State Farm Fire and Casualty Co.,* 558 F.Supp. 10 (E.D.Tenn. 1982). In *Sharpe,* the insured owned a collection of eight old motor vehicles that he housed in a garage on his property. These vehicles were unlicensed and never driven on public roads, although the insured occasionally "started the engines and drove the cars around the yard." When a fire destroyed the vehicles and the garage, the insurer claimed that the policy excluded coverage on the motor vehicles. The appellate court upheld a jury's finding that

the vehicles were in dead storage at the time of the fire and, therefore, not subject to the exclusion. Thus, the fact that the cars were operable and that the insured sometimes drove them on his property did not change the status of the cars for purposes of insurance coverage.

Like the insured in *Sharpe,* Geiwitz kept the car as a collectable item, *not* as a means of transportation. That the car was operable, that Geiwitz occasionally moved it from one part of the Cecils' property to their garage to work on it, that he imprudently and improperly obtained license tags for it, or that he was attempting to repair the gas gauge when the accident occurred did not change the status of the car as one in dead storage for purposes of coverage under the homeowner's policy. Had Allstate wished, it could have incorporated into the policy the very restrictions on the meaning of "dead storage" that it now asks us to find implied in the language that it actually used, *see Allstate v. Humphrey,* 246 Md. 492, 497–98, 229 A.2d 70 (1967); it chose not to do so. We hold that Geiwitz kept the car in dead storage on the Cecils' property within the meaning of that term as the parties used it in the homeowner's policy.

## II.

In its brief, Allstate noted that the trial court concluded that the car was in dead storage based on the following facts:

1) the subject vehicle was used as a showpiece and not as a means of transportation;

2) the vehicle was operable;

3) while owned by Defendant, the vehicle was operated only off of the public roadways and only for loading and unloading it from a trailer or for positioning the vehicle on a private driveway, in a garage or in a showplace;

4) the vehicle was repaired and maintained;

5) the vehicle was registered and licensed;

6) the vehicle was not insured for use on the highway
* * *

Allstate contends that under its definition of dead storage, findings 2, 4, and 5 cannot support the court's holding that the vehicle was in dead storage. Thus, it argues that the court relied solely on the fact that Geiwitz did not use the vehicle for transportation on public roadways as the basis for its conclusion, thereby "indulging in the forbidden practice of rewriting the subject insurance policy." Because we already have explained why we do not agree with Allstate's definition of dead storage, we need not address this argument further.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.